MARNE S. WILSON AND MARJORIE WILSON, PETITIONERS, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT

LYLE C. WILSON AND PEGGY WILSON, PETITIONERS, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 841–63, 842–63.   Filed August 19, 1964.

*Alfred E. Holland,* for the petitioners.
*Leo A. McLaughlin,* for the respondent.

916

918

OPINION

RAUM, *Judge:* Petitioners contend that their receipt of the Wil-Plan stock in 1958 was pursuant to a so-called spin-off that was entitled to nonrecognition under section 355 of the 1954 Code.[1]

When Wilson's, Inc., transferred its financing operations, consisting primarily of its installment sales contracts, to the newly organized Wil-Plan Co., and caused the stock of the latter to be distributed to petitioners, stockholders of Wilson's, Inc., the transaction fell precisely within the terms of section 355(a)(1)(A), which sets forth the first

---

[1] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

  (a) EFFECT ON DISTRIBUTEES.—

    (1) GENERAL RULE.—If—

      (A) a corporation (referred to in this section as the "distributing corporation")—

        (i) distributes to a shareholder, with respect to its stock, * * *

        *      *      *      *      *      *      *

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

      (B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

      (C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

      (D) [Not in issue herein] * * *

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

    *      *      *      *      *      *      *

  (b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

    (1) IN GENERAL. Subsection (a) shall apply only if either—

      (A) the distributing corporation, and the controlled corporation * * * is engaged immediately after the distribution in the active conduct of a trade or business, or

      (B) [Not applicable herein] * * *

    (2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

      (A) it is engaged in the active conduct of a trade or business, * * *

      (B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

      (C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

      (D) [Not in issue herein] * * *

condition for nonrecognition. Wilson's, Inc., was plainly a "distributing corporation," and it distributed to its own stockholders, Marne and Lyle Wilson, solely stock of Wil-Plan Co., which it controlled immediately before the distribution—all in literal compliance with section 355(a)(1)(A). So much is not disputed by the Government. But the Government does contend that two other conditions for nonrecognition have not been met, namely, the requirement in section 355 (a)(1)(B) that "the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation [Wilson's, Inc.]," and the condition in section 355(a) (1)(C) making applicable the requirements of section 355(b) relating to "active businesses." It does not rely upon any other statutory provisions to defeat nonrecognition which otherwise is literally available to petitioners under section 355. We hold that, on the facts of this case, the requirements of both (a)(1)(B) and (a)(1)(C) in conjunction with subsection (b), have been satisfied.

1. *Whether the transaction "was not used principally as a device for the distribution of the earnings and profits" of Wilson's, Inc.— Sec. 355(a)(1)(B).*—The burden of proof in respect of this requirement is upon petitioners. They have undertaken to meet that burden in part by attempting to prove alleged business reasons for the transaction having no connection with any distribution of earnings and profits. They contend that the transfer of conditional sales contracts and the financing operations to the new corporation was motivated by the following objectives: (*a*) To enable a separate finance company to make repossessions and to bring suits for delinquent payments in its own name without unfavorable customer reactions and without jeopardizing the goodwill of Wilson's, Inc.; (*b*) to enable a separate finance company to more easily purchase conditional sales contracts from other retail stores; (*c*) to make the sales program of Wilson's, Inc., more efficient by having its personnel devote all of their time to selling.

We are highly skeptical on the record before us that these three reasons, either separately or in the aggregate, were responsible to any substantial degree for the transfer. We think these reasons were largely colorable rather than real.

The action of Wilson's, Inc., subsequent to the incorporation of Wil-Plan contradicts petitioners' stated purpose to have a separate finance company make repossessions and to bring suits for delinquent payments in its own name so as not to jeopardize the goodwill of Wilson's, Inc. There was no attempt whatever by Wilson's, Inc., to disassociate itself from credit activities, which were carried on at the same premises, by the same persons, and in the same manner as they were prior to the incorporation of Wil-Plan. It was only after

a sale was made that a customer was put on notice that a separate corporate entity was involved in connection with credit matters, and the record gives every indication that the customer would associate Wilson's, Inc., with Wil-Plan to such an extent that the reputation and goodwill of the former could hardly be protected in any meaningful way by the incorporation of the latter.

Nor are we persuaded by the evidence that an expectation of financing conditional sales of other retail stores was a bona fide reason for the incorporation of Wil-Plan. The financing of conditional sales or other enterprises controlled by the petitioners could be handled just as easily without incorporating Wil-Plan, and we are not convinced by the fragmentary evidence that there was any real plan to finance the sales to any significant extent of any enterprises not controlled by them.

The third alleged reason—to make more effective utilization of personnel—seems to be spurious, since the relevant personnel activities after incorporation of Wil-Plan appear to have been substantially the same as before.

Notwithstanding that the three foregoing reasons do not appear to have been bona fide motives for the incorporation of Wil-Plan, we are nevertheless satisfied that the requirement of section 355(a)(1)(B) has been met. After all, that requirement is simply that "the transaction was not used principally as a device for the distribution" of earnings and profits, and the three reasons considered above were intended merely to prove motives other than to effect a distribution of earnings and profits. But even if petitioners failed to persuade us as to these three reasons, it was still open to them to convince us that the transaction was not in fact used principally as a device for the distribution of earnings and profits. And we think that the record before us establishes that the transaction was not so used.

This is not a case where accumulated cash or property having a readily realizable value was transferred to the newly organized corporation so that the distributee-stockholders could obtain such cash or property or the cash equivalent thereof, either by selling the distributed stock or liquidating the corporation, thereby converting what would otherwise be dividends taxable as ordinary income into capital gain—a transaction sometimes referred to as a "bail-out." Although the assets transferred to Wil-Plan had a high degree of liquidity, as stressed by the Government, we are satisfied by the evidence that the Wilsons intended to continue the financing activities with those assets, and that they had no intention either to liquidate Wil-Plan, to sell the stock of Wil-Plan, or in any other manner to siphon off for themselves the assets (or their equivalent) that had been transferred from Wilson's, Inc., to Wil-Plan.

The evidence before us shows that some 5 years have elapsed since the 1958 transaction, that Wil-Plan has been an actively operating corporation during this period, that there have not been any distributions in liquidation or partial liquidation of Wil-Plan, and that petitioners have not in fact sold or disposed of their Wil-Plan stock apart from the comparatively small amount transferred to the Silers several years later in 1960 or 1961 in connection with bringing about the absorption of Jon Siler Interiors into the Wilson furniture enterprise. Thus, the transaction has not in fact been used as a device or a cover for distributing earnings.[2] Moreover, Marne Wilson testified that neither at the time of incorporating Wil-Plan nor thereafter have there been any plans or intentions to sell its stock or the stock in Wilson's, Inc. To be sure, this was self-serving testimony that might carry but little weight in other circumstances, but it rang true to us in the context of this record. We hold that the transaction was not used as a device for distributing earnings and profits.[3]

We note the understandable concern expressed by the Government in its reply brief, particularly as applied to the next point but also equally applicable to the point now under discussion:

Although Congress has clearly provided for the tax-free division of an existing corporation, through the provisions of section 355, it is hard to believe that it intended to encompass thereby the case of the incorporation of accounts receivable, installment paper, etc. It would hardly be a difficult trick for the shareholder recipients to either collapse or sell off such a corporation at capital gain rates and immediately start accumulating new accounts or paper in a new corporation.

The answer to that position is that in the present case we have found that there was no plan or intention to achieve any such result and no attempt to do so has in fact been made. Where the distributees fail to carry their burden of proving that "the transaction was not used principally as a device for the distribution" of earnings and profits, the case will be decided against them. But that is no reason for re-

___

[2] Of course, the parenthetical limitation in sec. 355(a)(1)(B) provides that the "mere" fact that the distributed stock is sold subsequent to the distribution shall not be construed to mean that the transaction was used principally as the prohibited device unless the sale were pursuant to an arrangement negotiated or agreed upon prior to distribution. But these provisions do not state negatively that the absence of any such sale may not be taken as evidence that the transaction was not used for the prohibited purpose. Indeed, the very objective which the parenthetical provisions seek to attain would be furthered by taking into account the passage of a substantial period of time without any sale, particularly when accompanied by credible evidence that no sale was in fact planned or intended.

[3] The record does contain a memorandum of the Bank of America in connection with transferring the $350,000 line of credit from Wilson's, Inc., to Wil-Plan, stating that "The new financing entity is formed for convenience and income tax advantages." It did not identify the nature of those "advantages," but, whatever they were, we are satisfied they were not related to the distribution of earnings and profits. Perhaps the additional surtax exemption for the second corporation was contemplated, which, however, might be subject to attack under sec. 1551; but the purpose of obtaining that exemption could not convert the transaction into a device for distributing earnings and profits.

fusing to rule in favor of these petitioners, who have convinced us on this record that they were not motivated by the prohibited purpose.

2. *Whether the "active business" requirements are satisfied.*—Section 355(a)(1)(C) makes applicable the "active business" requirements of section 355(b), which in general (sec. 355(b)(1)(A)) restrict nonrecognition to those situations where the distributing corporation and the controlled corporation are each engaged immediately after the distribution in the active conduct of a trade or business. And section 355(b)(2) defines the words "engaged in the active conduct of a trade or business" as being limited by certain specific conditions, one of them being that "(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution." It is whether there has been compliance with this particular condition that is in dispute by the parties. There is no disagreement that the furniture business conducted by Wilson's, Inc., satisfies the 5-year requirement, nor does there appear to be any serious dispute that Wil-Plan was actively engaged in the conduct of a business immediately after the distribution. But there is sharp disagreement between the parties as to whether the financing business had been actively carried on during the preceding 5-year period within the meaning of the statute.[4]

The issue is largely factual, and this case lies somewhere between such cases as (1) *Isabel A. Elliott*, 32 T.C. 283, and *Theodore F. Appleby*, 35 T.C. 755, affirmed 296 F. 2d 925 (C.A. 3), certiorari denied 370 U.S. 910, holding that the spun-off business had not been actively carried on over the full 5-year period; and (2) *H. Grady Lester, Jr.*, 40 T.C. 947, holding that the particular activity spun off constituted a business actively conducted throughout the preceding 5 years. That the issue is factual in nature was recognized by the Court of Appeals in *Appleby*, when it affirmed the decision of this Court on the evidence, but stated at the same time that our decision "could have gone the other way."

We think that the financing activities here involved were of sufficient magnitude and character throughout the 5-year period to constitute an actively conducted business. To be sure, they were carried on with less intensity during the early part of that period when Wilson's, Inc., sold the contracts that it could not itself carry. But there appears to have been a substantial residue of installment paper in its hands even during that period, which obviously called for active attention in relation to such matters as collection, repossession, and the like. These activities were productive of significant amounts of income, and

---

[4] There is no controversy between the parties by reason of the financing activities having been conducted by the partnership rather than by Wilson's, inc., prior to its incorporation in 1955. See sec. 355(b)(2)(C), fn. 1, *supra.*

although this case may not be as strong as *Lester*, we think it lies on the same side of the line. We find and hold that the financing activities transferred to Wil-Plan constituted a business that had been actively conducted throughout the 5-year period immediately preceding the distribution of the Wil-Plan stock. In the circumstances it is not necessary to consider whether petitioners are entitled to prevail as to this issue in any event on the theory of *Edmund P. Coady*, 33 T.C. 771, affirmed 289 F. 2d 490 (C.A. 6), involving the division of a single business. Cf. *United States* v. *Marett*, 325 F. 2d 28 (C.A. 5) ; but cf. *Bonsall, Jr.* v. *Commissioner*, 317 F. 2d 61, 64–65 (C.A. 2).

*Decisions will be entered for the petitioners.*