**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Mary Archer W. MORRIS TRUST, North Carolina National Bank, Trustee, Respondent.**

No. 9837.

United States Court of Appeals Fourth Circuit.

Argued April 7, 1965.

Decided Oct. 5, 1966.

Commissioner treated their receipt of stock of the insurance company as ordinary income to the stockholders of the state bank. We agree with the Tax Court,[1] that gain to the stockholders of the state bank was not recognizable under § 355 of the 1954 Code.[2]

In 1960, a merger agreement was negotiated by the directors of American Commercial Bank, a North Carolina corporation with its principal office in Charlotte, and Security National Bank of Greensboro, a national bank. American was the product of an earlier merger of American Trust Company and a national bank, the Commercial National Bank of Charlotte. This time, however, though American was slightly larger than Security, it was found desirable to operate the merged institutions under Security's national charter, after changing the name to North Carolina National Bank. It was contemplated that the merged institution would open branches in other cities.

Fred R. Becker, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Acting Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, on brief), for petitioner.

Robert L. Hines and Richard E. Thigpen, Charlotte, N. C. (Richard E. Thigpen, Jr., Charlotte, N. C., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, J. SPENCER BELL, Circuit Judge, and STANLEY, District Judge.

HAYNSWORTH, Chief Judge.

Its nubility impaired by the existence of an insurance department it had operated for many years, a state bank divested itself of that business before merging with a national bank. The divestiture was in the form of a traditional "spin-off," but, because it was a preliminary step to the merger of the banks, the

■ For many years, American had operated an insurance department. This was a substantial impediment to the accomplishment of the merger, for a national bank is prohibited from operating an insurance department except in towns having a population of not more than 5000 inhabitants.[3] To avoid a violation of the national banking laws, therefore, and to accomplish the merger under Security's national charter, it was prerequisite that American rid itself of its insurance business.

The required step to make it nubile was accomplished by American's organization of a new corporation, American Commercial Agency, Inc., to which Amer-

---

1. Mary Archer W. Morris Trust, 42 T.C. 779.

2. 26 U.S.C.A. § 355.

3. 12 U.S.C.A. § 92. Because this section was omitted in the 1918 amendment and re-enactment of R.S. § 5202 (see Act of Apr. 5, 1918, c. 45, § 20, 40 Stat. 512), the Revisers of the United States Code have deleted the section upon the theory that it was repealed in 1918. That is not the view of the Comptroller of the Currency or of the Board of Governors of

the Federal Reserve System, however, which carry the provision as ¶ 11 of § 13 of the Federal Reserve Act. The requirement is incorporated in the Comptroller's current Regulations as 12 C.F.R. 2.1–2.5, and is regarded by others as in current effect. See Hackley, Our Baffling Banking System, Part II, 52 Va.L.R. 771, 777–779, and materials there cited. Whatever justification the position of the Code Revisers may have, the formal requirement of the Comptroller, who must approve the merger and its terms, had the force of law here.

ican transferred its insurance business assets in exchange for Agency's stock which was immediately distributed to American's stockholders. At the same time, American paid a cash dividend fully taxable to its stockholders. The merger of the two banks was then accomplished.

Though American's spin-off of its insurance business was a "D" reorganization, as defined in § 368(a) (1), provided the distribution of Agency's stock qualified for non-recognition of gain under § 355, the Commissioner contended that the active business requirements of § 355 (b) (1) (A) were not met, since American's banking business was not continued in unaltered corporate form. He also finds an inherent incompatibility in substantially simultaneous divisive and amalgamating reorganizations.

Section 355(b) (1) (A) requires that both the distributing corporation and the controlled corporation be "engaged immediately after the distribution in the active conduct of a trade or business." There was literal compliance with that requirement, for the spin-off, including the distribution of Agency's stock to American's stockholders, preceded the merger. The Commissioner asks that we look at both steps together, contending that North Carolina National Bank was not the distributing corporation and that its subsequent conduct of American's banking business does not satisfy the requirement.

A brief look at an earlier history may clarify the problem.

Initially, the active business requirement was one of several judicial innovations designed to limit nonrecognition of gain to the implicit, but unelucidated, intention of earlier Congresses.

Nonrecognition of gain in "spin-offs" was introduced by the Revenue Act of 1924. Its § 203(b) (3), as earlier Revenue Acts, provided for nonrecognition of gain at the corporate level when one corporate party to a reorganization exchanged property solely for stock or securities of another, but it added a provision in subsection (c) extending the nonrecognition of gain to a stockholder of a corporate party to a reorganization who received stock of another party without surrendering any of his old stock. Thus, with respect to the nonrecognition of gain, treatment previously extended to "split-offs" was extended to the economically indistinguishable "spin-off." [4]

The only limitation upon those provisions extending nonrecognition to spin-offs was contained in § 203(h) and (i) defining reorganizations. The definition required that immediately after the transfer, the transferor or its stockholders or both be in control of the corporation to which the assets had been transferred, and "control" was defined as being the ownership of not less than eighty per cent of the voting stock and eighty per cent of the total number of shares of all other classes of stock.

With no restriction other than the requirement of control of the transferee, these provisions were a fertile source of tax avoidance schemes. By spinning-off liquid assets or all productive assets, they provided the means by which ordinary distributions of earnings could be cast in the form of a reorganization within their literal language.

The renowned case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, brought the problem to the Supreme Court. The taxpayer there owned all of the stock of United Mortgage Corporation which, in turn, owned 1000 shares of Monitor Securities Corporation. She wished to sell the Monitor stock and possess herself of the proceeds. If the sale were effected by United Mortgage, gain would be recognized to it, and its subsequent distribution of the net proceeds of the sale would have been a dividend to the taxpayer, taxable as ordinary income. If the Monitor stock were distributed to the taxpayer before sale, its full value would have been taxable to her as ordinary income. In order materially to reduce that tax cost, United Mortgage spun-off the Monitor stock to a new cor-

4. See, 3 Mertens, Law of Federal Income Taxation § 20.101.

poration, Averill, the stock of which was distributed to the taxpayer. Averill was then liquidated, and the taxpayer sold the Monitor stock. She contended that she was taxable only on the proceeds of the sale, reduced by an allocated part of her cost basis of United Mortgage, and at capital gain rates.

The Supreme Court found the transaction quite foreign to the congressional purpose. It limited the statute's definition of a reorganization to a reorganization of a corporate business or businesses motivated by a business purpose. It was never intended that Averill engage in any business, and it had not. Its creation, the distribution of its stock and its liquidation, the court concluded, was only a masquerade for the distribution of an ordinary dividend, as, of course, it was.

In similar vein, it was held that the interposition of new corporations of fleeting duration, though the transactions were literally within the congressional definition of a reorganization and the language of a nonrecognition section, would not avail in the achievement of the tax avoidance purpose when it was only a mask for a transaction which was essentially and substantively the payment of a liquidating dividend,[5] a sale for cash,[6] or a taxable exchange.[7]

Such cases exposed a number of fundamental principles which limited the application of the nonrecognition of gain sections of the reorganization provisions of the Code. Mertens defines them in terms of permanence, which encompasses the concepts of business purpose and a purpose to continue an active business in altered corporate form.[8] As concomitants to the primary principle and supplements of it, there were other requirements that the transferor, or its stock-holders, retain a common stock interest and that a substantial part of the value of the properties transferred be represented by equity securities.[9]

Underlying such judicially developed rules limiting the scope of the nonrecognition provisions of the Code, was an acceptance of a general congressional purpose to facilitate the reorganization of businesses, not to exalt economically meaningless formalisms and diversions through corporate structures hastily created and as hastily demolished. Continuation of a business in altered corporate form was to be encouraged, but immunization of taxable transactions through the interposition of short-lived, empty, corporate entities was never intended and ought not to be allowed.

While these judicial principles were evolving and before the Supreme Court declared itself in Gregory v. Helvering, an alarmed Congress withdrew nonrecognition of gain to a stockholder receiving securities in a spin-off. It did so by omitting from the Revenue Act of 1934, a provision comparable to § 203(c) of the Revenue Act of 1924.

Nonrecognition of gain to the stockholder in spin-off situations, however, was again extended by § 317(a) of the Revenue Act of 1951, amending the 1939 Code by adding § 112(b) (11). This time, the judicially developed restrictions upon the application of the earlier statutes were partially codified. Nonrecognition of gain was extended "unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earn-

---

5. Morgan v. Helvering, 2 Cir., 117 F.2d 334, though the kind of redistribution of stockholder interests attempted there would probably be protected by the later provisions of the 1954 Code, § 355(a) (2) (A). See 3 Mertens, Law of Federal Income Taxation § 20.102, p. 506.

6. Pickard v. Commissioner, 2 Cir., 113 F. 2d 488, affg. 40 B.T.A. 258.

7. Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732; Electrical Securities Corp. v. Commissioner, 2 Cir., 92 F.2d 593.

8. 3 Mertens, Law of Federal Income Taxation, § 20.54, et seq.

9. Ibid. §§ 20.54–59.

ings and profits to the shareholders of any corporation a party to the reorganization."

If this transaction were governed by the 1939 Code, as amended in 1951, the Commissioner would have had the support of a literal reading of the A limitation, for it was not intended that American, in its then corporate form, should continue the active conduct of the banking business. From the prior history, however, it would appear that the intention of the A limitation was to withhold the statute's benefits from schemes of the Gregory v. Helvering type. It effectively reached those situations in which one of the parties to the reorganization was left only with liquid assets not intended for use in the acquisition of an active business or in which the early demise of one of the parties was contemplated, particularly, if its only office was a conduit for the transmission of title. The B limitation was an additional precaution intended to encompass any other possible use of the device for the masquerading of a dividend distribution.

The 1954 Code was the product of a careful attempt to codify the judicial limiting principles in a more particularized form. The congressional particularization extended the principles in some areas, as in the requirement that a business, to be considered an active one, must have been conducted for a period of at least five years ending on the distribution date and must not have been acquired in a taxable transaction during the five-year period.[10] In other areas, it relaxed and ameliorated them, as in its express sanction of non-prorata distributions.[11] While there are such particularized variations, the 1954 Code is a legislative re-expression of generally established principles developed in response to definite classes of abuses which had manifested themselves many years ear-

lier. The perversions of the general congressional purpose and the principles the courts had developed to thwart them, as revealed in the earlier cases, are still an enlightening history with which an interpretation of the reorganization sections of the 1954 Code should be approached.

Section 355(b) requires that the distributing corporation be engaged in the active conduct of a trade or business "immediately after the distribution." This is in contrast to the provisions of the 1951 Act, which, as we have noted, required an intention that the parent, as well as the other corporate parties to the reorganization, continue the conduct of an active business.[12] It is in marked contrast to § 355(b)'s highly particularized requirements respecting the duration of the active business prior to the reorganization and the methods by which it was acquired. These contrasts suggest a literal reading of the post-reorganization requirement and a holding that the Congress intended to restrict it to the situation existing "immediately after the distribution."

Such a reading is quite consistent with the prior history. It quite adequately meets the problem posed by the Gregory v. Helvering situation in which, immediately after the distribution, one of the corporations held only liquid or investment assets. It sufficiently serves the requirements of permanence and of continuity, for as long as an active business is being conducted immediately after the distribution, there is no substantial opportunity for the stockholders to sever their interest in the business except through a separable, taxable transaction. If the corporation proceeds to withdraw assets from the conduct of the active business and to abandon it, the Commissioner has recourse to the back-up provisions of § 355(a) (1) (B) and to the limi-

10. Section 355(b) (2).

11. Section 355(a) (2); cf. Morgan v. Helvering, fn. 5, supra.

12. See, also, the Senate Finance Committee Report explaining § 317 of the Revenue Act of 1951. Sen.Rep.No. 781, 82d Cong., 1st Sess. (1951), U.S. Code Congressional and Administrative News, p. 1969.

tations of the underlying principles. At the same time, the limitation, so construed, will not inhibit continued stockholder conduct of the active business through altered corporate form and with further changes in corporate structure, the very thing the reorganization sections were intended to facilitate.

■ Applied, to this case, there is no violation of any of the underlying limiting principles. There was no empty formalism, no utilization of empty corporate structures, no attempt to recast a taxable transaction in nontaxable form and no withdrawal of liquid assets. There is no question but that American's insurance and banking businesses met all of the active business requirements of § 355(b) (2). It was intended that both businesses be continued indefinitely, and each has been. American's merger with Security, in no sense, was a discontinuance of American's banking business, which opened the day after the merger with the same employees, the same depositors and customers. There was clearly the requisite continuity of stockholder interest, for American's former stockholders remained in 100% control of the insurance company, while, in the merger, they received 54.385% of the common stock of North Carolina National Bank, the remainder going to Security's former stockholders. There was a strong business purpose for both the spin-off and the merger, and tax avoidance by American's stockholders was neither a predominant nor a subordinate purpose. In short, though both of the transactions be viewed together, there were none of the evils or misuses which the limiting principles and the statutory limitations were designed to exclude.

We are thus led to the conclusion that this carefully drawn statute should not be read more broadly than it was written to deny nonrecognition of gain to reorganizations of real businesses of the type which Congress clearly intended to facilitate by according to them nonrecognition of present gain.

The Commissioner, indeed, concedes that American's stockholders would have realized no gain had American not been merged into Security after, but substantially contemporaneously with, Agency's spin-off. Insofar as it is contended that § 355(b) (1) (A) requires the distributing corporation to continue the conduct of an active business, recognition of gain to American's stockholders on their receipt of Agency's stock would depend upon the economically irrelevant technicality of the identity of the surviving corporation in the merger. Had American been the survivor, it would in every literal and substantive sense have continued the conduct of its banking business.

Surely, the Congress which drafted these comprehensive provisions did not intend the incidence of taxation to turn upon so insubstantial a technicality. Its differentiation on the basis of the economic substance of transactions is too evident to permit such a conclusion.

This, too, the Commissioner seems to recognize, at least conditionally, for he says that gain to the stockholders would have been recognized even if American had been the surviving corporation. This would necessitate our reading into § 355(b) (1) (A) an implicit requirement that the distributing corporation, without undergoing any reorganization whatever, whether or not it resulted in a change in its corporate identity, continue the conduct of its active business.

We cannot read this broader limitation into the statute for the same reasons we cannot read into it the narrower one of maintenance of the same corporate identity. The congressional limitation of the post-distribution active business requirement to the situation existing "immediately after the distribution" was deliberate. Consistent with the general statutory scheme, it is quite inconsistent with the Commissioner's contention.

■ The requirement of § 368(a) (1) (D) that the transferor or its stockholders be in control of the spun-off corporation immediately after the transfer is of no assistance to the Commissioner. It is directed solely to control of the transferee, and was fully met here. It con-

tains no requirement of continuing control of the transferor. Though a subsequent sale of the transferor's stock, under some circumstances, might form the basis of a contention that the transaction was the equivalent of a dividend within the meaning of § 355(a) (1) (B) and the underlying principles, the control requirements imply no limitation upon subsequent reorganizations of the transferor.

■■ There is no distinction in the statute between subsequent amalgamating reorganizations in which the stockholders of the spin-off transferor would own 80% or more of the relevant classes of stock of the reorganized transferor, and those in which they would not. The statute draws no line between major and minor amalgamations in prospect at the time of the spin-off. Nothing of the sort is suggested by the detailed control-active business requirements in the five-year predistribution period, for there the distinction is between taxable and non-taxable acquisitions, and a tax free exchange within the five-year period does not violate the active business-control requirement whether it was a major or a minor acquisition. Reorganizations in which no gain or loss is recognized, sanctioned by the statute's control provision when occurring in the five years preceding the spin-off, are not prohibited in the post-distribution period.

As we have noticed above, the merger cannot by any stretch of imagination be said to have affected the continuity of interest of American's stockholders or to have constituted a violation of the principle underlying the statutory control requirement. The view is the same whether it be directed to each of the successive steps severally or to the whole.

Nor can we find elsewhere in the Code any support for the Commissioner's suggestion of incompatibility between substantially contemporaneous divisive and amalgamating reorganizations. The 1954 Code contains no inkling of it; nor does its immediate legislative history. The difficulties encountered under the 1924 Code and its successors, in dealing with formalistic distortions of taxable transactions into the spin-off shape, contain no implication of any such incompatibility. Section 317 of the Revenue Act of 1951 and the Senate Committee Report, to which we have referred,[13] did require an intention that the distributing corporation continue the conduct of its active business, but that transitory requirement is of slight relevance to an interpretation of the very different provisions of the 1954 Code and is devoid of any implication of incompatibility. If that provision, during the years it was in effect, would have resulted in recognition of gain in a spin-off if the distributing corporation later, but substantially simultaneously, was a party to a merger in which it lost its identity, a question we do not decide, it would not inhibit successive reorganizations if the merger preceded the spin-off.

The Congress intended to encourage six types of reorganizations. They are defined in § 368 and designated by the letters "A" through "F." The "A" merger, the "B" exchange of stock for stock and the "C" exchange of stock for substantially all of the properties of another are all amalgamating reorganizations. The "D" reorganization is the divisive spin-off, while the "E" and "F" reorganizations, recapitalizations and reincorporations, are neither amalgamating nor divisive. All are sanctioned equally, however. Recognition of gain is withheld from each and successively so. Merger may follow merger, and an "A" reorganization by which Y is merged into X corporation may proceed substantially simultaneously with a "C" reorganization by which X acquires substantially all of the properties of Z and with an "F" reorganization by which X is reincorporated in another state. The "D" reorganization has no lesser standing. It is on the same plane as the others and, provided all of the "D" requirements are met, is as available as the others in successive reorganizations.

13. See fn. 12 and accompanying text.

We have not placed our reliance upon that provision of the National Banking Act[14] which continues the identity of each merging bank in the consolidated banking association which is deemed the same bank as each of the merging constituents. We have not done so, for, at best, it would supply an answer only to the Commissioner's most limited contention. Moreover, we have had previous occasion to point out the narrow purpose of that statute.[15] It was enacted to secure the continuing efficacy of previous fiduciary appointments of each of the constituent banks. It was not intended, as we held in *Fidelity-Baltimore,* to exempt merging banks from stamp taxes to which all other merging corporations are subject. Nor do we think it was intended, when enacted in 1959, to amend the reorganization sections of the 1954 Code or to accord to the stockholders of reorganizing banks more favorable tax treatment than that accorded the stockholders of other corporations undergoing comparable reorganizations. The comprehensive scheme of the 1954 Code was intended to have a uniform application. The courts should not import artificial distinctions into it.

█ Our conclusion that gain was not recognizable to American's stockholders as a result of the spin-off, therefore, is uninfluenced by the fact that the subsequent merger was under the National Banking Act. It would have been the same if the merger had been accomplished under state laws.

In a substantive sense, however, in every merger there is a continuation of each constituent. Each makes its contribution to the continuing combination, and the substantiality of that contribution is unaffected by such technicalities as a choice to operate under the charter of one constitutent rather than that of another. After the merger, North Carolina National Bank was as much American as Security. It was not one or the other, except in the sense of the most technical of legalisms; it was both, and with respect to the Charlotte operation, old American's business, it was almost entirely American. North Carolina National Bank's business in the Charlotte area after the merger was American's business conducted by American's employees in American's banking houses for the service of American's customers. Probably the only change immediately noticeable was the new name.

While we reject the technical provision of the National Banking Act as a basis for decision, therefore, it is important to the result that, as in every merger, there was substantive continuity of each constituent and its business. In framing the 1954 Code, the Congress was concerned with substance, not formalisms. Its approach was that of the courts in the Gregory v. Helvering series of cases. Ours must be the same. The technicalities of corporate structure cannot obscure the continuity of American's business, its employees, its customers, its locations or the substantive fact that North Carolina National Bank was both American and Security.

A decision of the Sixth Circuit[16] appears to be at odds with our conclusion. In *Curtis,* it appears that one corporation was merged into another after spinning-off a warehouse building which was an unwanted asset because the negotiators could not agree upon its value. The Court of Appeals for the Sixth Circuit affirmed a District Court judgment holding that the value of the warehouse company shares was taxable as ordinary income to the stockholders of the first corporation.

A possible distinction may lie between the spin-off of an asset unwanted by the acquiring corporation in an "A" reorganization solely because of disagreement as to its value and the preliminary spin-off of an active business which the acquiring corporation is prohibited by

14. 12 U.S.C.A. § 215(e).

15. Fidelity-Baltimore National Bank v. United States, 4 Cir., 328 F.2d 953.

16. Curtis v. United States, 6 Cir., 336 F. 2d 714.

law from operating. We cannot stand upon so nebulous a distinction, however. We simply take a different view. The reliance in *Curtis* upon the Report of the Senate Committee explaining § 317 of the Revenue Act of 1951, quite dissimilar to the 1954 Code,[17] reinforces our appraisal of the relevant materials.

To the extent that our own decision in *Elkhorn*[18] is relevant, it tends to support our conclusion, not to militate against it.

*Elkhorn* was one of the interesting cases which contributed to the development of the judicial principles which served, as best they could, to confine pretensive arrangements in the early days long before adoption of the 1954 Code. Mill Creek Coal Company wanted to acquire for Mill Creek stock one of the mining properties of Elkhorn. Had the bargain been effectuated, directly, it would have been clearly a taxable transaction, for Elkhorn had other *mining* properties. In an attempt to avoid the tax, Elkhorn's other properties were spun-off to a new Elkhorn; old Elkhorn conveyed its remaining properties to Mill Creek for stock and by successive transactions,[19] Elkhorn stockholders wound up owning stock in new Elkhorn which owned all of old Elkhorn's mining properties, except the ones transferred to Mill Creek, and the Mill Creek stock received by old Elkhorn. They were in precisely the same position as they would have been in if old Elkhorn had transferred the Mill Creek properties to Mill Creek for stock. It was an obviously transparent attempt to circumvent the requirement that substantially all of the properties must be transferred to qualify for nonrecognition in what would now be classified as a "C" reorganization.

The contention in *Elkhorn* was not that its stockholders realized gain on the spin-off. The opinion denying a rehearing, particularly, suggests the absence of recognizable gain as a result of the spin-off. It approved the recognition of gain as a result of the subsequent "C" reorganization.

It is difficult now to envision any other result in *Elkhorn*, since the stockholders' purpose of formalistic transformation of a clearly taxable transaction into the form of a series of untaxable transactions was so blatant. Nothing of the sort is present here. Interestingly, however, *Elkhorn* would question the recognition of gain in the merger exchange here, as to which the Commissioner wisely makes no contention under the 1954 Code, not recognition of gain at the earlier spin-off step. As to the first step, the *Elkhorn* opinion appears to oppose the Commissioner's present position.

For the reasons which we have canvassed, we think the Tax Court, which had before it the opinion of the District Court in *Curtis*, though not that of the affirming Court of Appeals, correctly decided that American's stockholders realized no recognizable taxable gain upon their receipt in the "D" reorganization of the stock of Agency.

Affirmed.

17. See text accompanying fn. 13.

18. Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732.

19. In a stock for stock exchange, new Elkhorn acquired all of the stock of old Elkhorn. Old Elkhorn was then dissolved and distributed in liquidation the Mill Creek stock, its only asset, to new Elkhorn.