**Leslie L. HANSON, individually and as executor of the Estate of Lillian L. Hanson, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Louise MERSEN, individually and Louise Mersen, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. Nos. 637–638.**

United States District Court,
D. Montana,
Billings Division.

Dec. 29, 1971.

Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., for plaintiffs.

Johnnie M. Walters, Asst. Atty. Gen., Jerome Fink, and James P. Parker, Attys., Dept. of Justice, Washington, D. C., and Otis L. Packwood, U. S. Atty., Billings, Mont., for defendant.

## ORDER AND MEMORANDUM OPINION

JAMESON, District Judge.

These actions were brought pursuant to 28 U.S.C. § 1346(a) (1), to recover income taxes paid by the plaintiffs for the year 1955.[1] At issue in each case is

---

1. Number 637 was brought by Leslie J. Hanson individually and as executor of the estate of Lillian L. Hanson, deceased. Number 638 was brought by Louise Mersen, individually, and Louise Mersen, Frank J. Mersen, Jr., and Harold L. Garnaas as executors of the estate of Frank J. Mersen, Sr., deceased. A tax deficiency of $14,175.54, plus interest, had been assessed against the Hansons, and a deficiency of $15,349.71, plus interest against the Mersens. The defi-

whether a distribution of stock of Hanson-Mersen Motors, Inc. to the shareholders of H–M Corporation qualified for tax free status as a "spin-off" under Section 355 of the Internal Revenue Code of 1954, 26 U.S.C. § 355, or was taxable to the plaintiffs as an ordinary dividend under Section 301(c) (1).

The parties express no disagreement as to the underlying facts and most have been stipulated.[2] They are, however, in disagreement as to the inferences and legal conclusions to be drawn from these facts. Since these inferences and conclusions are critical to the decision of this case, it is necessary to set forth the underlying factual situation in some detail.

### The Old Company

H–M Corporation (the old company) is a Montana corporation, with its principal place of business at Glasgow, Montana. Incorporated on February 21, 1940, its name was changed on March 14, 1941 to Hanson-Mersen Motors and on December 30, 1954 to H–M Corporation.[3]

From January 10, 1941 until at least December 31, 1959 the only shareholders of H–M were Leslie and Lillian Hanson and Frank and Louise Mersen.[4] From April 5, 1952 until December 31, 1954 they held stock in H–M as follows:

| Shareholder | Number of Shares |
|---|---|
| Leslie L. Hanson | 755 |
| Lillian L. Hanson | 5 |
| Frank J. Mersen, Sr. | 735 |
| Louise Mersen | 5 |
| Total | 1,500 |

On December 31, 1954 the shareholders of H–M surrendered, proportionately, 300 shares to the corporation for cancellation. Thereafter the shareholdings were as follows:

| Shareholder | Number of Shares |
|---|---|
| Leslie L. Hanson | 604 |
| Lillian L. Hanson | 4 |
| Frank J. Mersen, Sr. | 588 |
| Louise Mersen | 4 |
| Total | 1,200 |

Prior to December 31, 1954, H–M was engaged primarily in the sale of new and used cars at retail and related services. It was the Ford Motor Company dealer at Glasgow. It also provided financing [5] and owned the real property on which its business operations were located. In the years following the reorganization, H–M retained its operating plant, leasing it to Hanson-Mersen. It also provided all of Hanson-Mersen's "in-house" financing, engaged in some outside financing transactions, and made a number of advances to the new corporation. As a result of these operations, and the liquidation of its used car inventory in 1955, H–M made a small profit, ranging from $2,562.73 to $4,994.-67, in each of the years from 1955 through 1959. It did not maintain a separate office or telephone listing, or conduct any advertising in any of those years.

### The New Company

Hanson-Mersen Motors, Inc. was incorporated under Montana law on December 30, 1954, with its principal place of

---

ciencies were paid, timely claims for refund were disallowed, and these actions followed. Since both claims involve the same underlying facts and give rise to the same issues, they were consolidated for trial.

2. The court adopts, as findings of fact, the "Statement of Uncontested Facts" in the pre-trial order filed October 6, 1970. Further findings will be set forth in the course of this opinion.

3. H–M Corporation will be referred to as "H–M" or the "old company." Hanson-

Mersen Motors, Inc. will be referred to as Hanson-Mersen or the "new company."

4. During this period, Leslie Hanson served continuously as president and director, Lillian Hanson as secretary and director, Frank Mersen Sr. as vice-president and director, and Louise Mersen as director.

5. The nature and extent of H–M's financing operations will be given in more detail below.

business at Glasgow, and with authorized capital of 25,000 shares of voting and 25,000 of nonvoting, no-par common stock. Pursuant to the spin-off plan, on January 1, 1955, Hanson-Mersen exchanged 3,000 shares of voting and 3,000 shares of nonvoting stock for what amounted to H–M's new car business including the Ford Motor Company franchise. H–M, in turn distributed this stock to its shareholders pro rata. During 1955, Frank J. Mersen, Jr. and Ira Eugene Tourtlotte, employees of the new company, each purchased 125 shares of nonvoting stock, so that ownership in it was held as follows:

| Name of Shareholder | Voting Common | Nonvoting Common |
|---|---|---|
| Leslie L. Hanson | 1,510 shares | 1,510 shares |
| Lillian L. Hanson | 10 shares | 10 shares |
| Frank J. Mersen, Sr. | 1,470 shares | 1,470 shares |
| Louise Mersen | 10 shares | 10 shares |
| Frank J. Mersen, Jr. | 0 shares | 125 shares |
| Ira Eugene Tourtlotte | 0 shares | 125 shares |
| | 3,000 shares | 3,250 shares |

Also during 1955, Hanson-Mersen entered into a new franchise agreement with the Ford Motor Company.

After the reorganization on January 1, 1955, Hanson-Mersen was actively [6] engaged in the new car business and sold used cars which it acquired in trade. It did not, however, finance any of its sales and, in fact, borrowed substantial sums [7] from the old company. It also continued to lease its land and buildings from H–M.

### The Spin-Off

The plaintiffs contend, and defendant does not seriously dispute, that they undertook to spin-off Hanson-Mersen on advice of counsel and that the plan to do so was designed specifically to take advantage of the then recently enacted provisions of section 355.[8] Pursuant to the plan, the Ford Motor Company dealership, new car inventory, oil, gas and accessory business, and some cash were transferred to the new company in exchange for the 3,000 shares of voting and 3,000 shares of nonvoting stock. H–M retained its used car inventory, the balance of its current assets, and its land and buildings. The details of the transaction are summarized in the following schedule:

| | 12–31–54 assets of old company | 1–1–55 transfer to new company | Retained 1–1–55 by old company |
|---|---|---|---|
| Cash | $ 24,240.41 | $ 18,355.13 | $ 5,885.28 |
| Notes & receivables | 72,506.38 | - - - | 72,506.38 |
| Deposits | 1,064.30 | - - - | 1,064.30 |
| Securities | 5,550.00 | - - - | 5,550.00 |
| Inventories | 60,084.60 | 45,844.45 | 14,240.15 |
| Fixed assets (net of depreciation) | 4,499.05 | 4,499.05 | - - - |
| Utility deposit | 40.00 | 40.00 | - - - |
| Land & buildings (net of depreciation) | 29,727.28 | - - - | 29,727.28 |
| Reserves | 17,239.97 | - - - | 17,239.97 |
| | $214,951.99 | $ 68,738.63 | $146,213.36 |

6. The parties have stipulated that, "Immediately after the distribution to taxpayers of the stock in Hanson-Mersen Motors, Inc. (the new corporation) on January 1, 1955, that company was engaged in the active conduct of a trade or business within the meaning of § 355(b) (1) (A) of Internal Revenue Code of 1954."

7. A total of $66,500.00 was advanced in 1956, $20,800.00 in 1958, $31,000.00 in 1958 and $20,000.00 in 1959. All these advances were repaid.

8. Hanson testified that he and Mersen had been concerned for some time with the consequences to the old company in the event anything happened to either of them or the Ford Motor Company should cancel the franchise. They discussed their problems with local bankers and with a banker in Minneapolis, who referred them to a Minneapolis lawyer. The lawyer advised the formation of a new corporation to take over the Ford dealership and automobile servicing, with the old company retaining the existing

The new company also assumed the floor plan liability of the old company in the amount of $9,217.96.

In 1955, H–M liquidated [9] the used car inventory and did not thereafter engage in the used car business. Except for bookkeeping entries, the employees of Hanson-Mersen did not distinguish between the used cars retained by H–M and those acquired by the new company, and the inventories were to some extent comingled. In the years following the reorganization, H–M continued to act as Hanson-Mersen's landlord, although it did not lease property to any other person.

## Section 355

The requirements of Section 355 of the Internal Revenue Code of 1954 "are detailed and specific, and must be applied with precision." Commissioner of Internal Revenue v. Gordon, 1968, 391 U.S. 83, 92, 88 S.Ct. 1517, 1523, 20 L.Ed. 2d 448. They are plainly intended to be prophylactic in nature and are "a legislative re-expression of generally established principles developed in response to definite classes of abuses which had manifested themselves many years earlier." Commissioner of Internal Revenue v. Morris Trust, 4 Cir. 1966, 367 F.2d 794, 798. A corporation wishing to spin off a subsidiary must conform to the established rules, "however bona fide its intentions." Commissioner of Internal Revenue v. Gordon, supra, 391 U.S. at 94, 88 S.Ct. 1517.

Section 355 provides:

"(a) Effect on distributees.—

"(1) General rule.—If—

"(A) a corporation (referred to in this section as the 'distributing corporation')—

"(i) distributes to a shareholder, with respect to its stock,

\* \* \* \* \* \*

"solely stock or securities of a corporation (referred to in this section as 'controlled corporation') which it controls immediately before the distribution,

"(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both \* \* \*

"(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

"(D) as part of the distribution, the distributing corporation distributes—

"(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution,

\* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities."

\* \* \* \* \* \*

"(b) Requirements as to active business.—

"(1) In general.—Subsection (a) shall apply only if either—

"(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, \* \* \*

"(2) Definition.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active

---

used car inventory, the financing business, and title to the real property. He advised Hanson that stock of the new corporation could be distributed as a spin-off under section 355.

9. Hanson testified that, in addition to the retained inventory, H–M purchased "a few" additional used cars "to balance the stock \* \* \* but mainly we liquidated our used car inventory and put it into cash for carrying on the other lines, like the finance company and so forth."

conduct of a trade or business if and only if—

"(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

"(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

"(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

"(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

"(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), * * * "

■ The purpose of Congress in "sanctioning, in proper cases, tax-free spin-offs" was well summarized in Commissioner of Internal Revenue v. Wilson, 9 Cir. 1965, 353 F.2d 184, 186:

"(Section 355's) purpose and the purpose of its predecessors is to give to stockholders in a corporation controlled by them the privilege of separating or 'spinning off' from their corporation a part of its assets and activities and lodging the separated part in another corporation which is controlled by the same stockholders. Since, after the spin-off, the real owners of the assets are the same persons who owned them before, Congress has been willing that these real owners should be allowed, without penalty, to have their real ownership divided into smaller artificial entities than the single original corporation, if the real owners decide that such a division would be desirable.

\* \* \* \* \* \*

"This purpose of Congress was not expressly written into section 355, but the legislative history of the section shows that it underlay the drafting of the section. In his opinion in Parshelsky's Estate v. C. I. R., 303 F.2d 14 (CA 2), Chief Judge Lumbard recounts the pertinent legislative history of section 355 and its predecessors."

■ Commissioner of Internal Revenue v. Morris Trust, supra, also contains a detailed discussion of the purpose and effect of section 355 and prior legislation and recognizes that "immunization of taxable transactions through the interposition of short-lived, empty, corporate entities was never intended and ought not to be allowed." 367 F.2d at 797. The court noted that the detailed requirements of section 355 with respect to the continuation of both companies in the conduct of an "active business" modify and clarify prior statutes and concluded that a holding that Congress intended to restrict the requirements to the situation existing "immediately after the distribution * * * sufficiently serves the requirements of permanence and of continuity, for as long as an active business is being conducted immediately after the distribution, there is no substantial opportunity for the stockholders to sever their interest in the business except through a separable, taxable transaction."[10] Id. at 798.

10. The court continued: "If the corporation proceeds to withdraw assets from the conduct of the active business and to abandon it, the Commissioner has recourse to the back-up provisions of § 355(a) (1) (B) and to the limitations of the underlying principles. At the same time, the limitation, so construed, will not inhibit continued stockholder conduct of the active business through altered corporate form and with further changes in corporate structure, the very thing the reorganization sections were intended to facilitate." 367 F.2d at 798–799.

In addition to the literal requirements of section 355, both the regulations and case law require that the spin-off have a "business purpose." 26 C.F.R. § 1.355–2(c); Commissioner of Internal Revenue v. Wilson, supra. As stated in Wilson:

"(I)n addition to the requirements for tax-free spin-offs expressly written into section 355, the requirement stated for the Supreme Court of the United States by Mr. Justice Sutherland in the case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, is and has been an essential part of the law. That requirement is, briefly stated, that a literal compliance with the provisions of the statute relating to tax-free corporation reorganizations is not enough; that there must be a valid business purpose for the reorganization.[11] We refer again to Parshelsky's Estate, supra, for citations to the extensive literature on this subject.[12]

\* \* \* \* \* \*

"Congress, in enacting section 355 and its predecessors, was trying to give to business enterprisers leeway in readjusting their corporate arrangements to better suit their business purposes. If the rearrangement had that purpose, Congress was willing to concede them some possible tax advantages. If the rearrangement had no business purpose, let the taxes fall where they might." 353 F.2d at 186–187.

*Contentions of Defendant*

The defendant contends that "the distribution failed to meet the conditions of Section 355 because the parent corporation was not, immediately after the distribution, engaged in a business which had been actively conducted for five years prior to the distribution and because there was no business purpose for the distribution." It does not argue that the spin-off failed to meet § 355 requirements in other respects.

*Was H–M "Engaged in the Active Conduct of a Trade or Business?"*

Initially the plaintiffs maintained that "immediately after the distribution on January 1, 1955", H–M was engaged in three separate businesses, "financing, used car and real estate—which it had conducted during the five-year period ending with the distribution." In their reply brief, plaintiffs concede that the "owning of the real estate by the old corporation does not qualify as a trade or business under § 355(b)." [13]

---

11. In Gregory a corporation wholly owned by a taxpayer transferred 1,000 shares of stock in another corporation held by it to a new corporation, which issued all of its shares to the taxpayer. Within a few days the new corporation was dissolved and liquidated by the distribution of the 1,000 shares to the taxpayer, who immediately sold them for her individual profit. The Court held that there was no reorganization within the meaning of the statute, saying in part: "Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner." 293 U.S. at 469, 55 S.Ct. at 267.

12. In Parshelsky's Estate, the court held that the trier of facts must not only examine those reasons for the reorganization "relating to the business being carried on by the corporation, or relating otherwise to the corporation's organization or functioning", but must also examine the reasons "arising from and serving only the personal or noncorporate-business interests of the shareholders." 303 F.2d at 19.

13. Plaintiffs do contend, however, that the retention of the real estate by the old company does not in itself serve to disqualify the transaction from the tax benefit afforded by § 355(a), and they distinguish those cases cited by defendant where real estate was the sole asset transferred.

## Used Car Business

It is uncontested that for more than five years preceding the distribution, H–M sold used cars and trucks. Assuming that these transactions constitute a "trade or business",[14] it does not appear that H–M was "actively engaged" in the used car business immediately following the distribution. It is clear from the record that H–M intended to retain its used car inventory only to facilitate its orderly liquidation. In other words, at the time of the distribution, there was no present intent to continue in the used car business indefinitely.

■ The purpose of section 355 is to permit "such readjustment of corporate structures as is required by business exigencies and which, in general, effect only a readjustment of continuing interests in property under modified corporate forms." 28 C.F.R. § 1.355–2(c); cf. Commissioner of Internal Revenue v. Wilson, supra. The active trade or business requirement of section 355 clearly contemplates that the business be operated as a going concern intended to be operated indefinitely, even though subsequent events might force its liquidation.[15] The requirement is not satisfied by a "business" intended to be operated only so long as it takes to achieve its own liquidation.

Accordingly I conclude that H–M was not actively engaged in the used car business immediately after the distribution within the meaning of section 355.

## Financing Business

■ Whether the spin-off meets the "active business" requirement of section 355 accordingly narrows to determining whether H–M was engaged in the financing business for five years preceding and "immediately after" the distribution. Both § 355 and its interpretative regulations speak of "business" in functional terms. Thus 28 C.F.R. § 1.-355–1(c) defines a business as consisting of

"a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. It does not include—* * *

"(3) A group of activities which, while a part of a business operated for profit, are not themselves independently producing income even though such activities would produce income with the addition of other activities or with large increases in activities previously incidental or insubstantial."

In other words, a "business" is an identifiably separate group of business activities, conducted for their own sake, and for the purpose of earning a profit

14. Hanson testified on cross-examination:
"Q. During the five years prior to the spin-off did Hanson-Mersen ever realize a profit on its used car operations?
"A. Well, if you figure what is allowed for them and what they were sold for I don't think there is a dealer in the United States that makes a profit on them."
* * * * *
"Q. Why then did you deal in used cars?
"A. You have to to sell the new ones, you have to take trades."

15. This is consistent with the holding in Commissioner of Internal Revenue v.

Morris, supra. In that case a state bank spun off an insurance department it had operated for many years and then merged into a national bank. The Commissioner sought to tax the distributions on, as the court put it, the "economically irrelevant technicality" that the state bank did not survive the merger. In holding the distribution nontaxable, the court pointed out that, "There is no question but that American's insurance and banking businesses met all of the active business requirements of § 355(b) (2). It was intended that both businesses be continued indefinitely, and each has been." 367 F.2d at 799.

from them. Since the definition is functional and not superficial, the fact that a business has no telephone or separate business address, conducts no advertising or even that it is not held out to third persons as a separate entity, although relevant, are not dispositive of the question.[16]

The financing of automobiles is an activity quite distinct from their sale. It appears without significant contradiction that during 1950–54 and thereafter, H–M undertook "every operation which forms a part of" earning income from financing. During all of those years the old company financed a substantial portion of its sales on which time financing was provided.

Prior to January 1, 1955 sales made by the old company were financed as follows:

| Year | Number of Sales Financed by Company | Amount | Number Financed by other sources [17] | Amount |
|------|------|------|------|------|
| 1948 | 64 | $ 29,783.00 | 31 | $ 23,432.00 |
| 1949 | 157 | 75,238.00 | 62 | 44,274.00 |
| 1950 | 122 | 52,260.00 | 127 | 135,364.00 |
| 1951 | 57 | 27,420.00 | 185 | 138,475.00 |
| 1952 | 68 | 29,650.00 | 105 | 110,209.00 |
| 1953 | 66 | 26,591.00 | 138 | 150,819.00 |
| 1954 | 85 | 51,231.00 | 93 | 101,603.00 |

In addition, during the same period the old company financed 13 transactions in the total amount of $25,704.47 not arising out of sales by the company itself. Two involved partnerships in which Hanson and Mersen were partners and two involved employees of the company.

Sales by the new company during the years 1955 through 1959 were financed as follows:

| | Total Number of Sales | Number of Sales in Which Old Corporation Furnished Finance | Percent of Total Sales | Total Dollar Am't of Cash Proceeds | Dollar Am't Involved in Financed Sales | Percent of Total |
|------|------|------|------|------|------|------|
| 1955 | 313 | 95 | 30.4 | $393,887 | $73,678 | 18.7 |
| 1956 | 338 | 65 | 19.2 | 322,671 | 47,258 | 14.6 |
| 1957 | 336 | 70 | 20.8 | 382,687 | 51,611 | 13.5 |
| 1958 | 327 | 80 | 24.5 | 315,047 | 58,161 | 18.5 |
| 1959 | 426 | 71 | 16.7 | 440,697 | 52,224 | 11.8 |

16. In the recent case of American Savings Bank et al. v. Commissioner, 56 T.C. 828, filed July 20, 1971, the Tax Court said:

"Respondent points to a number of factors as supporting his assertion that the corporation conducted no business activity. That Cedar operated without employees, a separate office, a telephone, advertising, and a complete set of books and records is not conclusive on the issue of whether it actually conducted business activity. Where, as here, business was conducted through agents and an accurate record of income and disbursements was kept primarily with check stubs, the absence of the factors relied on by respondent does not justify ignoring that business operations were in fact being conducted."

17. The other financing sources included the Glasgow banks, the time financing organization of Ford Motor Company, and Messrs. Hanson and Mersen individually.

With respect to net profits, the following tables show the profits realized from the company's financing operations both before and after the spin-off:

| | Net Profit From Financing | Total Net Profit | Percent of Total [18] |
|---|---|---|---|
| 1950 | $ 938 | $ 53,383 | 1.75 |
| 1951 | 704 | 62,460 | 1.13 |
| 1952 | 664 | 55,956 | 1.19 |
| 1953 | 2,406 | 43,690 | 5.51 |
| 1954 | 1,253 | 26,070 | 4.81 |

| | Net Profit of Both Old and New Corporations | Net Profit of Old Corporation | Percent of Net Profit of Old Corporation of Combined Total |
|---|---|---|---|
| 1955 | $55,564.10 | $4,101.10 | 7.4 |
| 1956 | 33,250.85 | 3,507.85 | 10.5 |
| 1957 | 43,733.67 | 4,994.67 | 11.4 |
| 1958 | 22,949.73 | 2,562.73 | 11.2 |
| 1959 | 56,897.16 | 4,514.16 | 7.9 |

The case most nearly in point factually is Marne S. Wilson, 1964, 42 T.C. 914, reversed on appeal, Commissioner of Internal Revenue v. Wilson, supra.[19] The Tax Court held that a retail furniture corporation's transfer of its installment financing activities to a new corporation in exchange for stock which was distributed to its own stockholders met the "active business" requirements of section 355(b). This finding was not disturbed on appeal.

In Wilson, as here, there was "sharp disagreement between the parties as to whether the financing business had been actively carried on during the preceding 5-year period within the meaning of the statute." Recognizing that the "issue is largely factual", the Tax Court concluded that the "financing activities * *

were of sufficient magnitude and character throughout the 5-year period to constitute an actively conducted business." [20] 42 T.C. at 925.

 A comparable situation exists here. Although in competition with local banks and the Ford Motor Company's time financing plan, in each of the five years preceding the spin-off, the company financed from 57 to 122 sales, representing from 23.6% to 48.9% of the total financed sales. For each of the first five years after the spin-off it financed from 65 to 95 sales, representing from 36.5% to 52.3% of the total financed sales. Each year the financing business operated at a profit, although the amount was not large, particularly during the years 1950 through 1952.

Viewing the evidence as a whole, I find that the financing activities of H–M were carried on for the purpose of earning a profit and not as merely incidental to its other operations. While the company was not operating a finance company in the sense of an independent consumer loan operation, it was in competition with other sources of financing and was engaged in the financing business within the meaning of section 355.

### Was there a Business Purpose for the Spin-Off?

 As was noted in Commissioner of Internal Revenue v. Wilson, supra, the reason for the business purpose test is that § 355 was designed "to give to business enterprisers leeway in readjusting their corporate arrangements to better suit their business purposes." Lacking such a purpose a spin-off simply falls

18. All percentages are computed on net profit before deducting bonuses paid. If bonuses were deducted, the percentage of net income from financing would be substantially greater.

19. The case was reversed on the ground that the Tax Court had expressly found that the business purposes asserted by the taxpayer were not in fact bona fide motives and had concluded erroneously that it was not necessary to have a "business purpose."

20. The opinion continued: "To be sure, they were carried on with less intensity during the early part of that period when Wilson's, Inc., sold the contracts that it could not itself carry. But there appears to have been a substantial residue of installment paper in its hands even during that period, which obviously called for active attention in relation to such matters as collection, repossession, and the like. These activities were productive of significant amounts of income, * * *." 42 T.C. at 925.

outside its scope. 353 F.2d at 187. Accordingly, it is the genuineness of the business purpose that counts. A proper business purpose for a spin-off may in retrospect turn out to be inadequate or unnecessary to achieve its hoped for goals. This, by itself, does not disqualify the reorganization. Moreover, in determining whether there was a legitimate business purpose, the reasons for the reorganization arising from the personal or noncorporate business interests of the stockholders must be considered, as well as reasons relating to the business being carried on or to the corporation's organization or functioning. See note 12.

■ Plaintiff has advanced two separate business purposes for the spin-off— (1) "(t)o add management depth and to promote permanence in employment" in the automobile sales operation by bringing in additional shareholders and (2) to obtain a new franchise agreement with the Ford Motor Corporation with a different franchise cancellation clause.[21] Although it is true that H–M had amicable relations with Ford and some employees were not offered the opportunity to purchase stock in the new corporation, it does not appear that the asserted reasons were, as in Wilson, "afterthoughts presented in the litigation." 353 F.2d at 187. The spin-off plan was adopted only after consultation with financial and legal advisers. Ira Tourtlotte and Frank Mersen, Jr., salesmen employees, became shareholders of the new company, and it received a new franchise agreement from Ford. The defendant has failed to suggest what other reasons might have prompted the spin-off. Certainly tax avoidance does not appear to have been among them. I find that the spin-off was undertaken for valid and genuine business purposes.

■ Defendant argues, however, that assuming that there was a business purpose for the creation of the new company there was no business purpose for the distribution of its stock since the same objectives could have been accomplished by operating the new company as a subsidiary. It is true, of course, that the taxpayer must show a business purpose for both the formation of the subsidiary and the distribution of its stock by the parent. Parshelsky's Estate v. Commissioner of Internal Revenue, supra, 303 F.2d at 20; Bonsall v. Commissioner of Internal Revenue, 2 Cir. 1963, 317 F.2d 61, 65. However, it does not follow that a spin-off, prompted by valid business motives, can be taxed merely by showing that the same business purposes could have been served by some other form of reorganization.

■ It is apparent from the testimony that the stockholders of the old corporation and their advisers concluded that it would be easier to bring new ownership into a separate company operating the car sales, which depended upon salesmanship and management skill for its profitability.[22] The profits from the financing operations came primarily from the investment or loan of capital and involved little management. The spin-off of the old corporation's assets into two separate corporations was clearly prompted by this motivation and it furnishes an adequate business purpose to support the distribution. This being so, it is irrelevant that the same business

---

21. The Ford Motor Company franchise required the active participation of a named person in the conduct of the dealership. The franchise in effect prior to the spin-off contained a 60 day cancellation clause. This clause was not included in a new form of franchise agreement generally in effect at the time of the spin-off and does not appear in the franchise issued to the new company.

22. Hanson testified that it would be more difficult for the employees to buy into the company "with the garage facilities and our additional buildings and warehousing and lots", so they concluded that it would be better to divide the business "so stock could be sold in the operating franchise or to make it possible to sell out easier if we wanted to." As noted supra, the assets transferred to the new company were valued at $68,738.63 and those retained by the old company at $146,213.36.

purpose might have been equally well served by some other form of reorganization, such as formation of a subsidiary or a recapitalization of the old corporation.

This is not a case where the old company transferred to the new company assets which could readily be converted into cash or its equivalent. No earnings or profits were distributed to the stockholders in the spin-off. Nor did the stockholders obtain any cash or other property. There was no liquidation of either company, except for the liquidation of the used cars on hand at the time of the spin-off, and the proceeds therefrom were added to the capital used by H–M in the financing business. In other words, there is no evidence that the transaction was "used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation."

This opinion shall constitute the court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.