Leonard S. Krause v. Commissioner.
Krause v. Commissioner
Docket No. 4073-63.
United States Tax Court
T.C. Memo 1967-68; 1967 Tax Ct. Memo LEXIS 193; 26 T.C.M. (CCH) 358; T.C.M. (RIA) 67068; April 5, 1967
Leonard S. Krause, pro se, 6655 W. Olympic Bldg., Los Angeles, Calif. Morley H. White, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies in the petitioner's income tax as follows: Year
Amount
1955
$1,318.93
1956
650.30
$1,969.23
There was no pretrial stipulation in this case and three issues now remain in dispute. The first of these involves the proper treatment to be accorded a loss on advances to Irving Levin and/or Aircorp, Inc., which advances became worthless in 1956. Petitioner seeks to deduct the loss from ordinary income as a business bad debt under the provisions of section 166(a). [1] The respondent determined that the loss was a "nonbusiness debt" within the provisions of section 166(d) and as such, deductible only as a short-term capital loss. *195 The second issue involves the proper method of reporting gain received from the liquidation of two corporations in which the petitioner held stock. The petitioner alleges that when the corporations redeemed his stock they gave him fractional shares of a purchase money second mortgage on real estate. He further alleges that the terms of the second mortgage were such that the purchaser was obligated to pay the purchase price in five annual installments of principal and interest, and that therefore he is entitled to report his gain on an installment basis. The respondent maintains that the transaction was "closed" in 1955 (the year of liquidation) and that therefore all the gain must be reported in such year. The third and final issue concerns the correctness of the respondent's determination of the value of the property received as a liquidating distribution. General Findings of Fact The petitioner resides in Los Angeles, California. He filed timely individual income tax returns for the years in question with the district director of internal revenue, Los Angeles, California. The petitioner is a doctor of medicine who specializes in psychiatry; he has been so engaged since *196 he was discharged from the Army in 1946. Since graduation from medical school in 1941 the petitioner has been interested in the stock market and during the years in issue he was intensively engaged in buying and selling common stocks, and pursuing his market ventures. His dividends from stocks approximated his income from the practice of medicine during the years in issue. In 1955 the petitioner reported a gross income from the practice of medicine of $6,350, and dividend income of $5,575. In 1956 his income from the practice of medicine grossed $6,540 and his dividend income was $8,854. On his 1955 tax return the petitioner reported receiving dividends from 36 companies. He also sold some securities and dealt in egg futures. Similarly in 1956 he reported dividends from 59 companies and showed numerous securities transactions. The petitioner stated on his tax returns for 1955 and 1956 that he was engaged in both the practice of psychiatry and the investment business. Issue 1 Facts and Opinion The respondent has determined that losses which the petitioner sustained in 1956 in dealings with Irving Levin and the latter's company, Aircorp, Inc., were "nonbusiness debts" within *197 the provisions of section 166(d). To gain full deductibility of these losses against ordinary income the petitioner must show that the losses in question were incurred in connection with a trade or business of his. The petitioner has made a bewilderingly disjointed and confused record from which he has attempted to show that he was in the business of loaning money or promoting enterprises. We find that he maintained no place of business separate from the office he used to practice medicine, he never advertised the fact that he lent money, and never checked into the credit ratings of people to whom he advanced money. Furthermore, he kept no books of account and introduced as his only records a mass of cancelled checks, and a few promissory notes. The petitioner's own testimony and that of the one witness he called establishes that he made advances to a number of people. Every advance, however, which is cast in the form of a loan does not give rise to indebtedness. ; . Therefore, we must look into each transaction and see if the taxpayer's characterization accords with substantial economic *198 realty. Most recently, in , this Court pointed out that whether or not a particular transaction creates a valid debtor-creditor relationship is essentially a question of fact, about which the taxpayer has the burden of proof. . After pointing out numerous factors which are relevant in the proper characterization of a particular transaction, we said: It has been aptly stated that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." (C.A. 7, 1942), reversing . Although no one factor by itself is determinative of the question, a significant factor is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture, or were placed at the risk of the business." Gilbert v. Commissioner, 248 F. 2d at 406. Although , involved the disallowance of a net *199 operating loss carryover under section 23(e) of the 1939 Code, the case turned on whether the loss was incurred in the taxpayer's trade or business. [2]
After examining all the advances made by the petitioner we find that they fall into three categories: (1) Personal, nonbusiness advances, (2) investments, and (3) bona fide business loans. Some transactions have aspects of more than one category and where this has occurred we have included the transaction in more than one category. Turning first to those transactions which we find to be personal nonbusiness advances, we note that no number of such advances can either constitute a trade or business or be considered as evidence that petitioner was in the business of lending money. The petitioner made numerous advances, charging and expecting nothing for the use or forebearance of the money. This factor alone labels such an advance as personal and nonbusiness. Included in this category are the advances *200 to Elizabeth Barry, Mervin Field and Joe Berlin. We also include advances made to petitioner's friend, James Solomon, in this category on failure of proof of any provision for interest when the advances were made. Solomon was not even called as a witness even though he was shown to have been available. We also categorize advances to Herbert Paul as personal and nonbusiness because they bore interest only after maturity and because petitioner received only $5,900 worth of collateral on this $27,000 obligation. Petitioner also made advances to several of his psychiatric patients, but in none of these instances did he charge any interest. There is some suggestion that these advances to patients were made as part of their therapy. We observe that any such advances would at best be a part of petitioner's practice of medicine, and could not be considered as made in connection with a separate business of lending money. The second category of advances are those which we have found to be investments. Included in this category are a portion of the advances made to Irving Levin and Aircorp, Inc., (the losses here in issue) a portion of the advances made to Maurice Duke, and all the advances *201 to Harry Zevin and Artist's Embassy. In 1949 or 1950 the petitioner met Irving Levin when the latter came to install an air conditioner in petitioner's office. By 1954 the petitioner had advanced $90,000 to Levin and/or his company, Aircorp, Inc. The terms of these advances entitled the petitioner to a return of 2 percent per month plus 15 percent of any net profits from the air conditioner contracting business. The only security which the petitioner seems to have received consisted of having Levin name him beneficiary of several life insurance policies, plus an assignment of an account receivable from the price contractor for whom Levin was then working. Neither of these arrangements ever provided the petitioner with valuable, present security, and ultimately both became worthless. The insurance policies were never assigned to the petitioner (nor were they ever intended to have been), and when Levin and his company failed he allowed them to lapse. The account receivable, which was assigned to the petitioner when he made his last advance to Levin, never had any value because it was subject to offsets by the prime contractor. In 1954, the same year that the petitioner made his last *202 advance to Aircorp, Inc., the company failed. It made an assignment for the benefit of creditors in that year, and by January of 1956 it had been discharged in bankruptcy. Considering the speculative nature of the venture together with its attendant risks, and the fact that petitioner was to receive 15 percent of whatever net profits the business made, we find that some portion of the $90,000 he advanced to Irving Levin and/or his company was an investment in, and at the risk of the air conditioning business. Petitioner also made a series of advances to Maurice Duke in 1953. These were made in March and April, and totaled $6,000. They were repayable June 4, 1954, and bore interest at the rate of 10 percent and also provided that petitioner was to receive 5 percent of Duke's share of any net proceeds from the distribution of a motion picture which was to be produced. A contract dated July 7, 1954, extended the maturity date of the loan to August 15, 1964, and fully documented the facts of the relationship between the petitioner and Duke. In consideration for extending the maturity date of the loan, petitioner received a payment of interest up to August 1, 1954, and an increase in *203 his participation in the net proceeds of the film. In addition to his right to 5 percent of Duke's share of the net proceeds from distribution, he was also given a 5 percent interest in Duke's share of the net proceeds from any sale of the literary property on which the movie was to be based. To whatever extent the petitioner was induced to advance money to Duke because of the latter's promise of a 5 percent participation in any net proceeds of the film, we find that he placed his money at the risk of the venture and invested in the film. The remainder of the $6,000 advance was a loan, but the record affords insufficient basis for us to make any meaningful allocation. Transactions with Harry Zevin and a group called Artist's Embassy, of which Zevin was the manager, were embodied in a note dated September 28, 1956, in the amount of $10,000 signed by Harry Zevin. This note bore no interest charge, but an attached contract of the same date gave the petitioner the right to 33 percent of any net profits in excess of $10,000 which might be realized from the San Francisco production of Artist's Embassy's play "The Desk Set." The petitioner received no security, and on the basis of Zevin's *204 testimony we find that one of petitioner's reasons for making this advance was his personal desire to associate with theatrical people. These dealings with Harry Zevin and Artist's Embassy did not give rise to a debtor-creditor relationship. Here, the sole return which the petitioner was to have received from this transaction was 33 percent of net profits, if any, in excess of $10,000 which might be realized from the San Francisco production of a play. Petitioner was taking the risks of the venture and had no reasonable expectation of repayment unless the play was successful. Finally we come to the third category of advances, bona fide loans which bore interest and which, if made with sufficient regularity and in sufficient quantity, could constitute a separate business of lending money. As we pointed out in our discussion of those advances which we found to be investments, some part of the advances to both Irving Levin - Aircorp, Inc., and Maurice Duke were investments, but the balance of each could be said to be a bona fide business loan. The exact proportion of each which constitutes a loan cannot be calculated with any precision, and this indefiniteness, being of the petitioner's *205 own making, will weigh heavily against him. The petitioner's continuous relationship with Levin during the period 1949 to 1954, together with the dual character of the advances he made to him makes it impossible to determine either the number of actual loans made, or the times when they were made. Petitioner's testimony that he made between 26 and 50 "loans" is self serving and unsupported. The only specific information we have is that at some time after the last advance was made, a note for $125,000 reflecting all prior advances and accrued interest to date was signed. It bore interest at a rate of 2 percent per month and entitled petitioner to 15 percent of any net profits. Considering this evidence, we find only that some money was loaned during each of the years 1949 to 1954. The petitioner loaned $2,000 in September of 1956 to Allan Kirk and Sandy Scott for the production of a play. He obtained the guaranty of Evelyn Duke to secure payment, and interest was charged. The rate of interest was not established at trial, nevertheless we find that a bona fide loan was made. In 1957 the petitioner lent Joe Figueras and Joseph Gilligan $37,317.50 to enable them to start a business. *206 Interest was charged although the rate was not shown. Petitioner's statement that the rate "was probably ten percent" is not sufficiently definite to allow us to make a finding to this effect. It should be noted that the loans to Kirk and Scott in 1956 and to Figueras and Gilligan in 1957 were made after the loans to Levin and Aircorp, Inc. (the last of which was made in 1954) had gone bad. Because the relevant time period for determining whether petitioner was in the trade or business of lending money is 1949 through 1954 (see at fn. 3, on appeal (C.A. 8, Feb. 17, 1967)), these loans are of somewhat diminished relevance in determining whether during the years 1949 to 1954 the petitioner was engaged in the business of lending money. They may however be considered to suggest a continuing course of conduct. In , a taxpayer was held to be engaged in the business of lending money. There, in addition to the $90,000 in loans he made to one company which gave rise to the bad debt deduction in dispute, the taxpayer showed that he made $116,000 worth of other loans during *207 the year in question and that during a seven-year period he loaned money to twenty-seven other people. [3] In deciding the case, the court observed, p. 886, "Her activities in the business of lending money during 1950 were frequent and continuous, that is, extensive, varied and regular." Also cf. . In light of the facts which we have found, we conclude that the petitioner's bona fide lending activity was transacted on too small a scale and with insufficient regularity to allow us to find that he was in the business of lending money. On brief the petitioner has also urged that he was engaged in "any other business which would entitled him to full deduction" *208 from ordinary income. What other business he might have been in is not defined, however at trial there is some testimony which indicates that the petitioner feels he may be a promoter. Suffice it to say that he has failed utterly to so persuade us. No evidence has been introduced to show that his business was starting other businesses or that he was a dealer in enterprises. The decision in , holding that "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged," severely limited many of the prior promoter cases and general language contained in them is no longer valid. Having found that the $16,500 loss in issue was not incurred in connection with any trade or business of the petitioner, we hold that respondent's allowance of this loss as a nonbusiness bad debt was proper. Issue 2 Facts and Opinion The petitioner owned stock in Harris-Newmark, Inc. and 12th and Maple, Inc. These corporations owned certain real property which was sold in 1955. The respondent concedes that these corporations liquidated in 1955 pursuant to section 337, but has determined *209 that the liquidations were closed transactions in 1955 and that all of the gains should have been reported in that year. The petitioner contends that he is entitled to report such gains on the installment basis. Although petitioner does not explain his legal basis for his contention, there are only two theories on which he could possibly prevail. If he could have shown that whatever he received in the liquidations was not the "equivalent of cash," as that phrase is used in , then under the rule in that case ("the requirement has always been that the obligation, like money, be freely and easily negotiable so that it readily passes from hand to hand in commerce,") the values of the distributions would not have constituted "[amounts] realized" within the scope of section 1001(b). However, because the petitioner's proof is wholly inadequate we are unable to make a finding as to precisely what was distributed to him in the liquidations. Without knowing exactly what was distributed we cannot find that it was not the equivalent of cash. A reference to section 453 in petitioner's brief indicates that he feels this section entitles him to *210 report his gains in installments. However, section 453 as applied to the casual sale of personalty is applicable only where the payments received in the year of disposition do not exceed 30 percent of the total selling price. Here the petitioner has failed to show how much he received in his initial payments, and we must therefore find that he has failed to bring himself within the provisions of section 453(b)(2)(A)(ii). Furthermore, even if we were to accept the petitioner's allegations that his liquidating distributions consisted in part of a participation in a real estate mortgage made by a third party, the value of such participation certificates would have to be included in computing the amount of the initial payment he received in the year of sale. This is so because the certificates allegedly distributed would not have represented the obligation of either liquidating corporation but that of a third person. Section 453(b)(2)(A)(ii) requires evidences of indebtedness, other than those of the purchaser, which in this case were the liquidating corporations, to be included in computing the amount of the initial payment. , *211 affirmed sub nom. (C.A. 8, 1962). The petitioner alleges that all his gains were contained in these certificates, and the record shows that his gains were (as to each corporation) over 30 percent of petitioner's selling price, therefore it is clear that the requirements of section 453 are not met. The respondent's determination that all gain must be reported in 1955 is sustained. Issue 3 Facts and Opinion The petitioner asserts alternatively that the fair market value of the property distributed to him was worth less than the respondent has determined. Assuming arguendo that part of the property distributed was participation certificates in a mortgage, the petitioner has introduced no evidence which would establish the value of the certificates at the time of distribution. The correspondence which the petitioner introduced indicates that three years after the liquidations he sold a "Harris-Newmark certificate" for $8,300. Even assuming that this certificate was received as part of the liquidation, and that it was sold for a 12 to 15 percent discount in 1958, this is far from adequate proof of its fair market value at the *212 time of its distribution. Its sale price three years later, without more, speaks only as to its value at that time. We find, therefore, that petitioner has failed to sustain his burden of proving that the liquidating distributions made to him by 12th and Maple, Inc. and Harris-Newmark, Inc., had a value different from that determined in the deficiency notice. Decision will be entered for the respondent. Footnotes
1. All Code references are to the Internal Revenue Code of 1954 unless otherwise specifically noted.↩
2. Mr. Justice White has pointed out in , that the concept of a trade or business is the same in 23(e) of the 1939 Code, as in 23(k)(4), the 1939 predecessor of 166(d).↩
3. A similarly large quantity of loans was shown in both , where in addition to the debt which gave rise to the bad debt deduction, the petitioner proved numerous other loans to business enterprises, personal loans to employees, and mortgage loans, and in , where the petitioner was shown to have made over $300,000 worth of loans to forty people in five years.↩