OMAHA AIRCRAFT LEASING CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1437–78.     Filed May 13, 1980.

---

*Barbara W. Zandbergen,* for the petitioner.
*David J. Ryan,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioner's income tax of $5,633.96 for the taxable year 1973, $5,234.50 for the taxable year 1974, and $3,789.90 for the taxable year 1975. The sole issue for decision is whether petitioner is liable for the personal holding company tax imposed by section 541.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Petitioner is a corporation organized under the laws of the State of Nebraska, with its principal place of business in Omaha, Nebr.

Petitioner maintained its books and records and filed its Federal income tax returns using the accrual method of accounting and a taxable year ending November 30.

Petitioner was incorporated in 1964 for the primary purpose of providing financing for customers of its sister corporation, Sky Harbor Air Services, Inc. (Sky Harbor), a retailer of general aviation airplanes. Petitioner provided financing to Sky Harbor customers unable to secure conventional financing.

Between 1964 and 1969, all of petitioner's loans were made to Sky Harbor customers. The maximum number of loans outstanding to Sky Harbor customers in 1966 through 1967 was five. By 1969, only two of these loans remained outstanding. A dramatic change in the direction of petitioner's lending activities occurred in 1970. Due to the effects of a nationwide credit crunch, petitioner lent $110,000 to Sky Harbor for working capital purposes. Also in 1970, petitioner lent $8,000 in "startup" money to its newly formed sister corporation, Sky Mart, Inc. (Sky Mart), because of the latter's inability to obtain other financing. In addition to these loans, petitioner advanced a total of $40,000 "startup" money in 1971 and 1972 to another newly

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

formed sister corporation, Omaha Airplane Supply Corp. (OASC), because of the latter's inability to obtain alternate financing. By 1971, all of petitioner's loans to unrelated third parties had been repaid or otherwise liquidated, and the only loans outstanding were to these sister corporations.

In 1972 and 1973, certain changes were made with respect to the loans outstanding to the sister corporations: (1) Petitioner established a due date of December 31, 1982; (2) petitioner raised the interest rate from 9 percent to 12 percent; and (3) each of the debtor corporations executed a chattel mortgage in petitioner's favor to secure the loans. These chattel mortgages, however, were not filed until October 20, 1976, so as not to impair the financial standing of the debtor corporations. During the taxable year 1975, Sky Mart repaid the $8,000 owed to petitioner.

Petitioner's loans to its sister corporations tied up almost all of its working capital during the years in issue. In addition, petitioner's inability to borrow money at a rate sufficiently below the maximum interest it could charge on new loans precluded it from raising additional funds. As a result of these two factors, petitioner had virtually no funds available to lend to unrelated third parties between 1973 and 1975.

Petitioner's financial statements reflected the balance sheets for November 30, 1973, 1974, and 1975, as shown below.

OMAHA AIRCRAFT LEASING CO.

Comparative Balance Sheet

For the Years Ended Nov. 30, 1973, 1974, and 1975

|  | 1973 | 1974 | 1975 |
|---|---|---|---|
| ASSETS | | | |
| *Current assets:* | | | |
| Cash | $9,081.69 | $839.21 | $192.07 |
| Accounts receivable—affiliated companies: | | | |
| Sky Harbor | 1,281.00 | 10,637.00 | 19,113.00 |
| Sky Mart | 300.00 | 640.00 | 0 |
| OASC | 5,400.00 | 9,400.00 | 12,200.00 |
| Total current assets | 16,062.69 | 21,516.21 | 31,505.07 |
| *Other assets:* | | | |
| Notes receivable—affiliated companies: | | | |
| Sky Harbor | 110,000.00 | 110,000.00 | 110,000.00 |
| Sky Mart | 8,000.00 | 8,000.00 | 0 |

| | | | |
|---|---|---|---|
| OASC............................................ | $40,000.00 | $40,000.00 | $40,000.00 |
| Total other assets................................ | 158,000.00 | 158,000.00 | 150,000.00 |
| Total assets..................................... | 174,062.69 | 179,516.21 | 181,505.07 |

LIABILITIES
*Current liabilities:*

| | | | |
|---|---|---|---|
| Notes payable to sole stockholder............. | 7,720.00 | 0 | 0 |
| Accrued interest payable........................ | 4,320.00 | 4,320.00 | 4,610.80 |
| Provision for taxes.............................. | 3,064.98 | 1,760.64 | 1,044.56 |
| Total current liabilities............................ | 15,104.98 | 6,080.64 | 5,655.36 |

*Long-term obligation:*
Note payable to sole stockholder

| | | | |
|---|---|---|---|
| (6-percent unsecured)........................... | 72,000.00 | 79,000.00 | 76,000.00 |
| Total liabilities.................................. | 87,104.98 | 85,080.64 | 81,655.36 |

*Stockholder's equity:*

| | | | |
|---|---|---|---|
| Capital stock..................................... | 50,000.00 | 50,000.00 | 50,000.00 |
| Retained earnings ............................... | 36,957.71 | 44,435.57 | 49,849.71 |
| Total stockholder's equity ........................ | 86,957.71 | 94,435.57 | 99,849.71 |
| Total liabilities and stockholder's equity........................................... | 174,062.69 | 179,516.21 | 181,505.07 |

Petitioner had no employees or facilities of its own; rather, petitioner utilized Sky Harbor's personnel and facilities to administer its affairs. Among the services performed by Sky Harbor on petitioner's behalf were the processing of loan applications, the running of credit checks, the repossessing of aircraft, and the other normal activities associated with the operation of a financing company. In exchange for these services, petitioner paid Sky Harbor a percentage of its gross income. Initially, this rate was arbitrarily set at 18 percent subject to periodic reviews to assess how accurately it reflected petitioner's actual use of the Sky Harbor facilities and personnel. A reduction of the rate to 15 percent occurred in 1969 in order to reflect the lower number of outstanding loans to unrelated parties.[2] The rate remained at 15 percent from 1969 through 1975.

Petitioner reported gross income of $18,960 for the taxable

---

[2] The loans to related parties were less expensive to service than the loans to unrelated third parties.

year ending November 30, 1973, $18,960 for the taxable year ending November 30, 1974, and $18,160 for the taxable year ending November 30, 1975. Petitioner derived its income in these years solely from interest on the loans made to Sky Harbor, Sky Mart, and OASC.

Petitioner claimed the following deductions on its 1973, 1974, and 1975 taxable year Federal income tax returns:

|  | 1973 | 1974 | 1975 |
|---|---|---|---|
| State income tax | $335.00 | $363.00 | $283.00 |
| Occupation tax | 37.50 | 37.50 | 37.50 |
| Professional fees | 245.00 | 220.00 | 229.00 |
| Interest | 4,320.00 | 4,320.00 | 4,610.80 |
| General and administrative | 2,844.00 | 2,844.00 | 2,724.00 |

Vincent DeSciose (DeSciose) is the sole shareholder and president of petitioner. He has occupied these positions since petitioner's incorporation in 1964. DeSciose is also the sole shareholder and president of each of the aforementioned sister corporations, i.e., Sky Harbor, Sky Mart, and OASC.

DeSciose received no dividend payments or salary payments directly from petitioner during 1973, 1974, or 1975. During these years, Sky Harbor paid DeSciose a yearly salary of $14,400. DeSciose spent approximately 2 percent of his time working on petitioner's affairs. Petitioner has never made any personal loans to DeSciose or to a member of his family.

Respondent determined that for 1973, 1974, and 1975, petitioner was subject to the personal holding company tax imposed by section 541.

OPINION

The issue for decision is whether petitioner Omaha Aircraft Leasing Co. was a personal holding company in 1973, 1974, or 1975.

To constitute a "personal holding company," which is subject to the tax imposed by section 541, a corporation must meet both a stock ownership and an income test prescribed by section 542(a). There is no dispute between the parties that petitioner qualifies as a personal holding company under section 542(a). Rather, the dispute centers on whether petitioner fits within the "lending or finance company" exception to the personal holding company definition as provided in section 542(c).

In pertinent part, the "lending or finance company" exception provides:

SEC. 542. (c) EXCEPTIONS.—The term "personal holding company" as defined in subsection (a) does not include—

\* \* \* \* \* \* \*

(6) a lending or finance company if—

(A) 60 percent or more of its ordinary gross income (as defined in section 543(b)(1)) is derived directly from the active and regular conduct of a lending or finance business;

(B) the personal holding company income for the taxable year (computed without regard to income described in subsection (d)(3) and income derived directly from the active and regular conduct of a lending or finance business, and computed by including as personal holding company income the entire amount of the gross income from rents, royalties, produced film rents, and compensation for use of corporate property by shareholders) is not more than 20 percent of the ordinary gross income;

(C) the sum of the deductions which are directly allocable to the active and regular conduct of its lending or finance business equals or exceeds the sum of—

(i) 15 percent of so much of the ordinary gross income derived therefrom as does not exceed $500,000, plus

(ii) 5 percent of so much of the ordinary gross income derived therefrom as exceeds $500,000, but not $1,000,000; and

(D) the loans to a person who is a shareholder in such company during the taxable year by or for whom 10 percent or more in value of its outstanding stock is owned directly or indirectly (including, in the case of an individual, stock owned by members of his family as defined in section 544(a)(2)), outstanding at any time during such year do not exceed $5,000 in principal amount;

\* \* \* \* \* \* \*

(d) SPECIAL RULES FOR APPLYING SUBSECTION (c)(6).—

(1) LENDING OR FINANCE BUSINESS DEFINED.—

(A) IN GENERAL.—Except as provided in subparagraph (B), for purposes of subsection (c)(6), the term "lending or finance business" means a business of—

(i) making loans,

(ii) purchasing or discounting accounts receivable, notes, or installment obligations,

(iii) rendering services or making facilities available in connection with activities described in clauses (i) and (ii) carried on by the corporation rendering services or making facilities available, or

(iv) rendering services or making facilities available to another corporation which is engaged in the lending or finance business (within the meaning of this paragraph), if such services or facilities are related to the lending or finance business (within such meaning) of such other corporation and such other corporation and the corporation rendering

services or making facilities available are members of the same affiliated group (as defined in section 1504).

Petitioner contends that it has satisfied each of the four conditions required by section 542(c)(6) for each of the years in issue. On the other hand, respondent argues that petitioner fails to fit within the definitional exception in two respects, either one of which is sufficient to warrant the imposition of the personal holding company tax. Respondent's arguments are: (1) Petitioner was not engaged in the "active and regular conduct" of a lending or finance business during the years in issue; and (2) even if petitioner were engaged in the active and regular conduct of a lending or finance business, it failed to satisfy the business-expense test set forth in section 542(c)(6)(C). For the reasons stated below, we agree with respondent's first contention.[3]

The lending or finance company exception embodied in section 542(c)(6) is intended to encompass only those companies which are actively and regularly engaged in the lending or finance business. The "active and regular" requirement not only pervades the statutory framework, but the legislative history of that section is replete with references to that requirement: "The exceptions [in sec. 542(c)] are provided because the types of companies involved are engaged in an active trade or business despite the nature of their income." S. Rept. 2047, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 248. See also S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 614.

The mechanical tests provided in section 542(c)(6) begin with the premise that the corporation in issue is actively and regularly engaged in the lending or finance business. See sec. 542(c)(6)(A) and (C). Therefore, before these tests may be applied, we must determine whether that threshold requirement has been satisfied.

Neither the legislative history of section 542(c)(6) nor its predecessor indicates what constitutes "active and regular conduct." Moreover, the legislative history does not indicate

---

[3]On brief, respondent also argued that petitioner made loans to its sister corporations due to exigent circumstances and not because petitioner was in the business of making loans. Accordingly, respondent contended petitioner was not a lending or finance company from 1973 to 1975. See sec. 542(d)(1)(A)(i). Because of our agreement with respondent's other argument, we do not address this issue.

whether the "active and regular" requirement refers to the number of transactions engaged in by the company or the amount of business activity associated with the company's lending or finance operations. See S. Roberts & L. Kaster, "Commercial Finance Companies and the Personal Holding Company Exception," 42 Taxes 638 (1964).[4] In this case, the facts clearly indicate that petitioner's lending and finance activities were not conducted on an active and regular basis in the years in issue on either basis.

First, in 1973 and 1974, petitioner had only three loans outstanding, and all were to its sister corporations. This number was reduced to two in 1975 when Sky Mart repaid its loan. These loans were outstanding prior to 1973, and no new advances were subsequently made. The number of loans and their status does not rise to the level of an active lending operation.

Second, petitioner's activities were not of sufficient magnitude and character to constitute an actively and regularly conducted lending or finance business. The servicing of petitioner's outstanding loans to its sister corporations required little, if any, effort or expense. These were long-term loans which, during the years in issue, were secured by unperfected security interests. The only apparent activity required of petitioner was the collection of interest, yet, it appears that petitioner permitted two of the debtor corporations, Sky Harbor and OASC, to postpone paying substantial portions of the interest due on their loans.[5]

Petitioner, perhaps sensing the inactive picture painted by the above facts, contends that its operations during the years in issue entailed more than the mere servicing of the existing

---

[4]An example provided by the authors of the cited article illustrates this point:

"For example, suppose a company's sole business activity consists of extending a $1,000,000 line of open credit each to X and Y, two unrelated manufacturers, under a single loan agreement with each. Although the company has made only two loans, it employs 10 persons, regularly engages in extensive activity checking credit of X's and Y's customers, billing and collecting their accounts receivable and performing budgeting services for them. Is this the 'active and regular conduct' of [a lending or finance business]? * * * [S. Roberts & L. Kaster, 'Commercial Finance Companies and the Personal Holding Company Exception,' 42 Taxes 638, 644 (1964).]"

[5]The increase in petitioner's accounts receivable appears to be attributable to these interest postponements. Considering the relationship of the parties, it is not surprising that petitioner would opt to "lend" its sister corporations the past-due interest rather than to institute any legal actions to recover these amounts.

intercompany loans. Vincent DeSciose, president and sole stockholder of both petitioner and Sky Harbor, testified that during the period 1973–75, petitioner received loan applications from parties interested in purchasing aircraft from Sky Harbor. The facts, however, do not support DeSciose's testimony. Petitioner had virtually no available funds to lend nor potential sources for such funds from 1973 through 1975 and, accordingly, it is questionable that petitioner would consider applications for loans it could not make. Moreover, petitioner was unable to produce any business records or documents supporting any of these alleged activities. Respondent subpoenaed "Any and all documents relating to the lending or financing business of Omaha Aircraft Leasing Company during the fiscal years ending November 30, 1970, 1971, 1972, 1973, 1974 and 1975 including, but not limited to: loan applications, contracts, security agreements * * * and related correspondence." Petitioner, however, was unable to find any records or correspondence relating to these alleged activities occurring from 1973 through 1975. Although the degree to which businesses maintain records and correspondence varies greatly, we do not believe it is merely coincidental that no documents were presented to corroborate DeSciose's testimony.

According to DeSciose, petitioner also served as a financial counselor to potential customers of Sky Harbor insofar as it aided those customers in finding financing for their purchases.[6] DeSciose did not explain how such services would have been of business benefit to petitioner, as distinguished from Sky Harbor.

Third, the dormant state of petitioner's lending activities was not of short duration. Petitioner's lending activities remained unchanged during the entire 3 years in issue. In fact, the transformation of petitioner's activities from active to passive began sometime prior to 1973.

Petitioner argues that we should take a broad or cumulative view of its activities in determining whether its conduct was active and regular. Under this approach, periods of inactivity would not taint the broader view of the company's operational history. Any validity to this proposition would be limited to

---

[6]We do not comment on whether such counseling services would qualify as part of a lending or finance business under sec. 542(d)(1)(A).

temporary disruptions or dislocations in a company's normal operations.[7] The length of the inactive period in this case clearly brings it beyond any reasonable notion of transience.

In sum, petitioner was not engaged in the active and regular conduct of a lending or financing business during the years in issue.[8] Petitioner, during the years in issue, served solely as a vehicle through which DeSciose provided necessary long-term financing to his other wholly owned corporations. It is not insignificant that DeSciose provided all of petitioner's loanable funds through personal loans to petitioner at 6 percent or through the retention of his equity in petitioner. In essence, petitioner served as DeSciose's "incorporated pocketbook" during the years in issue and, accordingly, petitioner falls within the intendment of section 541.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[7] See sec. 1.542–5(c), Proposed Income Tax Regs., 33 Fed. Reg. 12553 (Sept. 5, 1968).

"a corporation shall be presumed to be engaged in the "active and regular" conduct of a lending or finance business if for the taxable year and at least one of the two immediately preceding taxable years at least 60 percent of its ordinary gross income consists of gross income derived directly from the conduct of a lending or finance business."

[8] The result reached herein is buttressed by comparing the "activity" tests applied elsewhere. Cf. *Wilson v. Commissioner,* 42 T.C. 914, 925 (1964), revd. on other grounds 353 F.2d 184 (9th Cir. 1965), and *Hanson v. United States,* 338 F. Supp. 602, 612 (D. Mont. 1971) (both cases applying the "active conduct" test of sec. 355). Also cf. *Imel v. Commissioner,* 61 T.C. 318, 323 (1973), and *Krause v. Commissioner,* 26 T.C.M. 358, 36 P–H Memo T.C. par. 67,068 (1967) (determining whether a taxpayer's lending activities qualify as a trade or business). Also cf. *Davenport v. Commissioner,* 70 T.C. 922, 934–935 (1978) (Judge Featherston dissenting) (determining whether a small loan company, Greenbelt Finance, Inc., was "largely an operating company" under sec. 1.1244(c)–1(g)(2), Income Tax Regs.).